United States District Court

Northern District of Indiana

Hammond Division

| United States of America | Case No.: 2:12-CR-160 JVB |
|---|---|
| v. | |
| Anthony Bitterling and Roy Dunn | |

**OPINION AND ORDER**

I.

Roy Dunn and his stepson Anthony Bitterling pled guilty to conspiring to commit health care fraud in violation of 18 U.S.C. § 1349. They started an ambulance company, Hoosier EMS, which billed and was paid by Medicare for fraudulent services. As relevant to this case, at the direction of Dunn and Bitterling, Hoosier EMS repeatedly transported twelve patients by ambulance to dialysis centers and represented to Medicare that the patients were unable to walk, while in fact they were able to walk and thus were ineligible for ambulance services under Medicare strictures. Hoosier EMS billed Medicare for over $2,000,000 and received $1,088,039 in payments.[1] The paid amount represents 80% of the Medicare allowable amount ($1,362,416) for ambulance services; the remaining 20% was supposed to be the patients' responsibility as copay, but Hoosier EMS never attempted to collect this difference. However, Hoosier EMS did bill $109,629 of the overall copay amount to secondary insurers of three of the twelve patients who had such insurance, but it is not clear how much they were actually paid.

---

[1] To avoid clutter in this order, the Court rounds the cents to the nearest dollar amount of all financial figures.

The Court must decide the loss amount for the purpose of calculating the final offense level under the United States Sentencing Guidelines as well as the amount of restitution owed by each defendant. The Court held a three-day evidentiary hearing and allowed the parties to further brief the issues raised at the hearing. The briefing has been concluded, and although some questions remain unanswered, the Court can now issue its preliminary findings.

II.

While Defendants admit that they had conspired to defraud Medicare, they minimize their participation. Dunn claims that he had only a limited role with the company from when it started in April 2009 until he bought Bitterling's share at the end of the year, and claims that some of the ambulance services were in fact covered by then existing Medicare regulations. He submits that at some intervals the twelve patients had been deemed by their doctors to require nonemergency, repetitive ambulance services and therefore were covered under Medicare. Dunn contends that the pre 2012 version of 42 C.F.R. § 410.40(d)(2) required no more than a physician's certification, which the company had obtained, that ambulance transportation was a medical necessity for the twelve patients in question.[2]

---

[2] Before 2012, 42 C.F.R. § 410.40(d)(2) provided:
> Special rule for nonemergency, scheduled, repetitive ambulance services. Medicare covers medically necessary nonemergency, scheduled, repetitive ambulance services if the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements of paragraph (d)(1) of this section are met. The physician's order must be dated no earlier than 60 days before the date the service is furnished.

Dunn argues that the amount of restitution he owes is $540,521. He derives this figure by subtracting from the total of Medicare payments the payments in 2009 ($82,762) and the payments that he argues were for transportation pursuant to valid physician certifications ($464,757). He does not detail the latter payments nor reference the physician certifications. Dunn maintains that intended loss is the same as actual loss.

Bitterling, in turn, believes that he's responsible for only $159,892. Like Dunn, he argues that loss amount is the sum Medicare paid to Hoosier EMS as a result of the conspiracy.[3] However, he insists that he withdrew from the conspiracy when he sold his interest in the company to Dunn and therefore should not be held responsible for any Medicare payments beginning in 2010.

As for the government, it maintains that none of this is up for discussion. According to its counsel, each defendant pleaded guilty to conspiracy to defraud Medicare with the understanding that the intended loss figure would be over $2,000,000 and the restitution payments would equal $1.088,039, the amount of money Medicare paid during the course of fraud; only the arguments about when they became coconspirators and when the conspiracy ended are properly before the Court.

III.

Under the United States Sentencing Guidelines ("U.S.S.G."), the loss amount is the greater of the actual loss or the intended loss. Intended loss means "the pecuniary harm that was

---

[3] Bitterling does not claim that some of the rides were lawful under then existing code of federal regulations, and concedes that actual loss amount is $1,088,039.

intended to result from the offense." U.S.S.G. § 2B1.1, Application Note 3(A)(ii). The amount of the intended loss depends on the nature of the scheme. Hoosier EMS billed Medicare for over $2,000,000. If there were evidence that, in billing for this amount, Dunn and Bitterling intended to get paid that much, the intended loss would be over $2,000,000. However, the evidence presented at the hearing shows that neither of them had such expectations. They were both aware that Medicare paid for services according its own fee schedule that was based upon miles driven and the geographical location of the patients.[4] The evidence showed that Medicare sent enough information to Hoosier EMS for anyone to understand that its payments would be subject to an established fee schedule. And even if Defendants had overlooked this information initially, they would have caught on quickly after a couple months of Medicare consistently paying lower amounts than what was billed for. In fact there's no evidence that at any time Defendants directed anyone to attempt to collect from Medicare more money than what Medicare paid Hoosier EMS. Likewise, Hoosier EMS did not attempt to collect the copay amounts from any of the persons it transported fraudulently. The scheme was simple: bill the Medicare at the prevailing rate, get paid by Medicare according to its fee schedule, and move on.

With one exception. Three of the twelve patients had secondary insurance policies, and Hoosier EMS billed these secondary insurance companies for the copay amount (the 20% of the Medicare fee schedule), for a total of $109,629. It's not clear how much the secondary insurers paid Hoosier EMS, but there's evidence that payments were substantial. Regardless, submitting the claims to secondary insurers was done with the intent of getting additional payments.

---

[4] In his brief, Dunn tries to cloak himself in ignorance about Medicare billing. Ironically, if he had been ignorant of the fee schedule, then his intended loss would be the billed amount. *Cf. United States v. Iwuala*, 789 F.3d 1, 14 (1st Cir. 2015) ("[T]he defendant's problem is that, professing great ignorance about the whole scheme, he offered no direct evidence that he expected Medicare to pay less than his cohort billed."). Yet the Court does not believe that Dunn was as clueless as he claims. The concept of Medicare's fee schedule is rather simple and even an unsophisticated person can understand it.

Whereas the evidence is clear that Hoosier EMS did not attempt to collect from the patients themselves, billing the secondary insurers wasn't a mere formality. Accordingly, while the intended loss amount is the same as the actual loss amount in relation to Medicare billing, $109,629 must be added in calculating the total intended loss amount.

Next, the Court will consider the issues pertaining to each defendant's liability.

## IV.

Dunn claims that he joined the conspiracy late (beginning of 2010, when he purchased Bitterling's interest in the company), and therefore should not be responsible for repaying any amounts that Medicare paid to Hoosier EMS in 2009. In addition, he maintains that many of the transports were authorized under then existing 42 C.F.R. § 410.40(d)(2).

Dunn insists that in 2009 he was a just a mechanic for Hoosier EMS with no knowledge of the ambulance business and no role in the fraudulent Medicare scheme. In making these assertions, Dunn is flirting with losing the acceptance of responsibility reduction under the United States Sentencing Guidelines. The facts show that, even if he didn't understand the ambulance business entirely, he did understand how to bilk Medicare. In February 2009, Dunn contacted Alliance Bank to secure funding for Hoosier EMS. Dunn provided the bank with information regarding what he estimated average per patient income would be ($63,000 for in-town runs and up to $100,000 per year, per patient). Dunn identified Bitterling as the co-owner. Dunn advised the bank that, "Currently, we have four prospective clients that have verbally stated that they will use our services when we are ready for business". And the bank's records from September 24, 2009, show that Dunn held himself out as having started up Hoosier EMS

and was the point person regarding financing and expanding the business. Moreover, in applying for Medicare participation, Dunn and Bitterling identified themselves as persons with ownership interests and managing control of Hoosier EMS. On April 12, 2009, Dunn and Bitterling contracted with Med-Bill to provide billing services for Hoosier EMS. These circumstances point to a man who knew much more than he is willing to admit. In addition, codefendant Mayotte testified at the evidentiary hearing that, although at the outset, Dunn was at Hoosier EMS once a week, beginning in May or June 2009, he came in more often, and, starting in June or July, was directing Mayotte to avoid the word "walked" on the run sheet.

In its post hearing brief, the government does not address Dunn's argument that the ambulance rides for the patients who were certified by physicians as requiring ambulance services did not violate any laws. Instead, the government focuses on the fact that Medicare forms were used sporadically, that they did not align with the language of the regulations, and that some physicians later acknowledged that the patients certified as unable to walk were getting to their doctor's appointments by car. The government seems to think that EMTs were in the best position, as one physician testified, to determine whether a patient needed an ambulance ride. The government also points out that Defendants instructed Hoosier EMS staff that, if a physician did not certify a patient as eligible for ambulance rides, to seek other physicians who would. None of this solves the legal question of whether Hoosier EMS was entitled to rely on a physician's certification, unless the certification was obtained through fraud.

On the basis of the record so far, the Court accepts Dunn's argument that 42 C.F.R. 410.40(d)(2), as written during the course Hoosier EMS existence, required no more than a physician's certification that an ambulance ride was medically necessary. *See id.* ("Medicare covers medically necessary nonemergency, scheduled, repetitive ambulance services if the

6

ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements of paragraph (d)(1) of this section are met. The physician's order must be dated no earlier than 60 days before the date the service is furnished."). The Court reaches this conclusion from the plain language of the Code of Federal Regulations. Hoosier EMS was not required to second guess these certifications if they were obtained legally. *See MooreCare Ambulance Serv., LLC v. Dep't of Health & Human Servs.*, No. 1:09-0078, 2011 WL 839502, at *3 (M.D. Tenn. Mar. 4, 2011) ("Clearly, the C.F.R. establishes a "special rule" for certain kinds of repetitive services, whereby a sufficiently detailed and timely "doctor's note" demonstrates medical necessity. Therefore, where the service is "scheduled" and "repetitive" and the "doctor's note" is sufficient, additional review of the record to determine medical necessity is not called for under the regulations.").

But Dunn is not off the hook yet. Dunn merely concludes that the ambulance rides pursuant to physician certifications were legal and subtracts $464,757 from the overall amount. He does not explain which rides those were and which time periods they included. Nor does he show that the certifications were issued without any fraud. Of course, while the burden is on the government to establish loss and restitution amounts in question, if Dunn is going to argue that certain rides were legal, he needs to back up his contention with evidence. Or he should argue that government failed its burden of proof. Otherwise, one begins to wonder whether he is still accepting responsibility for his actions.

The government's and Dunn's counsel are ORDERED to confer and identify the rides Dunn claims to be legal and to be ready to address their legality at his sentencing hearing. If it becomes apparent that these questions will not be resolved short of a trial, Court will consider

vacating Dunn's guilty plea. At least fourteen days before the sentencing hearing, Dunn's counsel should provide to the Court all relevant information regarding the rides he believes did not violate the law.

V.

Bitterling does not claim that some of the rides for the twelve patients were legal. Rather, he contends that intended loss over the period of the conspiracy is the same as actual loss. He also claims that he withdrew from the conspiracy at the end of 2009 and is, therefore, responsible for only $159,892.

As explained above, the Court agrees with Bitterling's first point, except that intended loss includes the additional amount of copay bills submitted to secondary insurers. However, the Court is not convinced that Bitterling withdrew from the conspiracy once he sold his share of the business to Dunn. "Withdrawal from a conspiracy is easier to state than achieve. Withdrawal requires an affirmative act on the part of the conspirator; he must either make a full confession to the authorities, or communicate to each of his coconspirators that he has abandoned the conspiracy and its goals." *United States v. Sax*, 39 F.3d 1380, 1386 (7th Cir. 1994). "Merely ceasing participation in the conspiracy, even for extended periods of time, is not enough' to evidence withdrawal. Instead, the conspirator must take affirmative steps to defeat or disavow the conspiracy's purpose. Until he does, he is presumed to continue in the conspiracy." *Id*. (citations omitted). "[A] defendant does not withdraw from a conspiracy if he "continues to receive benefits from the conspiracy's operations." *United States v. Swiss Valley Farms Co.*, 912 F. Supp. 401, 402 (C.D. Ill. 1995) (citing *United States v. Antar*, 53 F.3d 568, 583 (3d Cir.1995)

8

(resignation from a corporation insufficient to establish a withdrawal because defendant continued to receive "the fruits of the fraud;" i.e, the defendant retained stock in the corporation after his resignation); *United States v. Eisen*, 974 F.2d 246, 269 (2d Cir.1992) (the defendant's resignation from the conspiring law firm was not sufficient to constitute a withdrawal because he "continued to be entitled to a percentage of the recovery on all cases he tried including those giving rise to his pre-[resignation] racketeering acts")).

Bitterling's claim that he withdrew from the operations of Hoosier EMS is contradicted by Mayotte's testimony, which the Court credits. According to her, Bitterling remained active in the operations of Hoosier EMS even after the sale, because the sale only meant to protect his assets during his divorce proceedings. Moreover, the arrangement of the sale itself was such that Bitterling would be receiving future income from Hoosier EMS, income which Bitterling knew would be tainted with illegal ambulance runs. In fact, about a quarter of Hoosier EMS's profit was from the twelve patients identified in the indictment. Also, the sale did not stop Bitterling from continuing to work for Hoosier EMS, nor did he change his directives to employees transporting patients to the dialysis centers. While Bitterling has presented testimony from some employees that his role was minimized after the sale, there's no evidence that he abdicated his influence in the company.

VI.

For the reasons stated above, the Court finds that the loss in this case is the actual loss plus the $109,629 billed by Hoosier EMS to secondary insurers of the three out of twelve patients. The Court also finds that both Defendants were active coconspirators from the time the

Medicare fraud started until the end. Therefore, their restitution liability will be joint and several for the entire amount of the actual loss. However, the Court reserves judgment as to the overall loss amount and restitution owed by each defendant until it hears more from Dunn and the government as directed above.

The Court denies Defendants' motions to exclude evidence of the secondary insurance policies (DEs 151 & 152) as moot.

SO ORDERED on September 10, 2015.

                                              s/ Joseph S. Van Bokkelen  
                                              JOSEPH S. VAN BOKKELEN  
                                              UNITED STATES DISTRICT JUDGE